# N. Y. SUPERIOR COURT.

## WILLIAM M. DAVIDSON agt. E. R. HOLDEN *et al.*

*The owner of a cargo in a barge may recover for a loss against the owners of the steamboat towing the barge for negligence, although there is no privity of contract. Unseaworthiness of the barge not necessarily a defense to this action, nor overloading.*

Where a barge is towed by a steamboat, the steamboat is the superior mind, and the captain of the barge cannot prevent the pilot of the steamboat from going out. The assent or dissent of such a captain as to proceeding on the voyage is scarcely material.

If the contractor or freighter is negligent in providing an unseaworthy barge, the shipper may, nevertheless, either sue him or his sub-contractors (the owners of the steamboat), in case of loss by stress of weather, occasioned as well through the negligence of the sub-contractors as through the inherent unsoundness of the barge.

The owners of the steamboat are responsible to the shippers for negligence in going out in stormy weather, and thus occasioning loss of cargo, although there is no privity of contract between them.

The overloading of the barge, or the barge's unseaworthiness being evident to, or known of by, defendant's pilot, are no defense here.

*Trial Term, April,* 1880.

DEFENDANTS were the owners of a steamboat known as the "William J. Booth."

Plaintiff shipped upon the barge "Warren" a cargo of coal, to be carried by said barge from Hoboken, New Jersey, to Newtown Creek, Long Island, at a certain agreed rate of freight, to be paid by plaintiff to the owners of the barge.

Defendants contracted with the owners of the barge to tow said barge, with other barges, from Hoboken to Newtown Creek, for a certain towage, to be paid by the owners of the barge.

The steamboat proceeded to tow the "Warren" to Newtown Creek, but the sea being rough the "Warren" shipped

a quantity of water, in consequence of which the "Booth" put in at pier No. 3, North river, where the water shipped was pumped out. Nevertheless the steamboat again put out with the tow in charge, and the "Warren" became filled with water and sunk, and her cargo of coal was thereby lost.

The defendants' witnesses testify that the captain of the barge insisted on going out the second time, and that the barge was overloaded. Defendants offer testimony to show that the barge was rotten and unseaworthy, and one of defendants' officers stated that he had known the barge for some years, and had for that time known her to be unseaworthy.

*W. G. Peckham* and *E. W. Tyler*, for plaintiffs.

*Welcome R. Beebe* and *Edward H. Hobbs*, for defendants.

SPEIR, *J.* — There are three parties interested. There is no testimony here that the owner of the coal had anything to do with the defendants' tug, and all he had to do was to deliver his coal on board the "Warren." It was not his duty to see how she was loaded; it was not his duty in this case to see whether the "Warren" was a good vessel. The moment the tow was taken charge of by the tug, that moment the owner of the barge had nothing else to do; because the tug was the superior mind. Then the captain of the tug is the man that is supposed to know the port and the character of the channel, the winds and the weather; and there was no man who could interfere with him when he undertook to tow the "Warren;" that is the law.

Now let us see what the plaintiff could do originally. He could either sue the defendant as he has done, or he could sue the owner of the "Warren."

If the barge was unfit for service, they had just as much knowledge of that fact as the plaintiff who seeks to recover, and more.

There is no evidence here whatever that the plaintiff knew

anything about the condition of the boat. The defendant's pilot says he had known the "Warren" for two years. Now where is the responsibility? If the defendants, when they undertook to remove that boat in the North river in the morning, saw that the weather was so bad that it was dangerous, and, if they saw it was a boat that would fill through leaks, they had that knowledge, and it was in their power to refuse to take her at all. It was their duty to refuse if they knew she was not a fit vessel. They could not have been compelled to take her, and when they did take her, they undertook a responsibility which they were bound to discharge.

You will perceive at once that the owner of the "Warren" could not say anything. He had not the management of her; he had committed her care entirely to the captain and to the navigators of the tug.

I lay down this rule of law to guide you in determining these questions about which there has been a variety of opinions (one side claiming that the boat was in a wretched condition and the other side maintaining that it was seaworthy). Assuming that the "Warren" was not in such a condition as she ought to have been in, it is for you to say did the captain or the managers of the tug know it? What had they done? They had already undertaken to carry that vessel; and it was notice of the weather and of the character of the vessel when they had to put in before they went around the Battery. They started and had put into Pier 3. They had pumped her out. If she was so bad a vessel as that, and if you find that she did put in and that they did pump her out, it is for you to say whether they did not have notice of all her imperfections, and if they did, then all these rules of law must control.

Whatever knowledge of the barge the defendant's pilot and captain in charge had from previously towing her, and from his previous knowledge of the barge that he has testified to, is the same as if the defendants had personal knowledge of the barge.

Verdict for the plaintiff.